**Joseph G. Sansone**
**Julia C. Green**
**Gregory R. Bockin**
**Karen M. Klotz**[*]
**SECURITIES AND EXCHANGE COMMISSION**
**Philadelphia Regional Office**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**(215) 861-9613 (Klotz)**
**Email: klotzk@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | Case No.  1:26-cv-3203 |
| Plaintiff, | |
| v. | **COMPLAINT** <br> **JURY TRIAL DEMANDED** |
| **HARSH V. PATEL,** | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint and

Demand for Jury Trial against defendant Harsh V. Patel ("Patel" or "Defendant"), alleges as

follows:

**SUMMARY OF THE ALLEGATIONS**

1.      This case arises from defendant Patel's scheme to manipulate the prices of

hundreds of securities, which distorted the market, deceived investors into buying the targeted

securities at artificially inflated prices, and netted Patel more than $5 million in illicit profits.

2.      From at least May 2021 to at least January 2024 (the "Relevant Period"), Patel

used at least 10 different accounts at three different registered broker-dealers to carry out his

---

[*] Application for admission *pro hac vice* to be filed.

scheme. As broker-dealers discovered Patel's manipulative trading and restricted and closed his accounts, Patel then used accounts in the name of an estranged family member, which he opened without the family member's knowledge or consent, and of a friend to continue his scheme and avoid detection.

3. To carry out his scheme, Patel first rapidly placed a large number of small lot market orders to purchase a single security, which increased the price of the security in a matter of minutes. Patel typically did this in thinly traded securities, which are easier to manipulate.

4. Second, Patel placed non-bona fide limit orders to buy that same security, which he did not intend to execute, to falsely indicate to the market that there was additional buying interest in the security and to buoy the security's price.

5. Third, Patel sold the same security that he had just acquired in a few large-lot market orders at the now-inflated price. Finally, Patel quickly canceled the buy limit orders that he had placed to keep the security at artificially inflated prices.

6. Patel often implemented and completed this trading strategy in a matter of minutes and engaged in this conduct more than one thousand times, trading in hundreds of different securities during the Relevant Period.

## **VIOLATIONS**

7. By engaging in the conduct described in this complaint, Patel has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9.      The Commission seeks a final judgment: (a) permanently enjoining Defendant from directly or indirectly engaging in conduct in violation of the laws this Complaint alleges he has violated; (b) permanently enjoining Defendant from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in his name, the names of any immediate family members, the name of any company over which he has any control, or the name(s) of any third party individuals, without providing the relevant broker-dealer(s) a copy of the Complaint and any final judgment entered against him in this action; (c) ordering Defendant to disgorge all ill-gotten gains received as a result of the violations alleged herein, and to pay prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (d) ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Defendant directly and indirectly has made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in

3

connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of conduct alleged in this Complaint occurred within this District. For example, Defendant conducted his manipulative trading scheme on exchanges located in this District, and many of the issuers whose securities were manipulated by Defendant are headquartered in this District.

## THE DEFENDANT

13.     Harsh V. Patel, age 37, resided in San Juan, Puerto Rico during the Relevant Period and is a full-time day trader.

## RELEVANT ENTITY

14.     **NextGen Vision Inc.** ("NextGen") is an S corporation based in Puerto Rico and was incorporated by Patel in Pennsylvania in February 2018. During the Relevant Period, NextGen was controlled solely by Patel and was used for Patel's securities trading.

## TERMS USED IN THIS COMPLAINT

A.     **The National Best Bid and Offer**

15.     National Best Bid is the highest reported price a buyer is willing to pay to buy a security.

16.     National Best Offer is the lowest reported price that a seller is willing to accept to sell a security.

17.     The spread between the National Best Bid and the National Best Offer is referred to as the "NBBO." The NBBO is publicly reported to the market and represents the tightest bid-ask spread for a particular security.

**B.     Thinly Traded Securities**

18.     Thinly traded securities are securities that have low trading volume. As compared to more actively traded securities with a greater trading volume, thinly traded securities often have fewer interested buyers and sellers and larger NBBO spreads. Thus, a small number of orders or trades can significantly impact the market price of thinly traded securities, rendering them more susceptible to manipulation than securities that are more actively traded.

**C.     Limit Orders**

19.     A limit order is an order to buy or sell a security at a specified price or better and can only be executed if the market price reaches the limit price. A buy limit order can only be executed at the limit price or lower, and a sell limit order can only be executed at the limit price or higher.

20.     While limit orders do not guarantee execution, they help ensure that an investor does not buy for more than or sell for less than a pre-determined price.

**D.     Market Orders**

21.     A market order is an order to buy or sell a security at the current market price. A small lot market order, also known as an "odd lot market order," is an instruction to buy or sell fewer than 100 shares of a security. A large lot market order, also known as a "round lot market order," is an instruction to buy or sell 100 shares or a multiple of 100 shares of a security at the best available price.

## FACTS

I.    **Patel Implemented a Scheme to Manipulate the Price of Securities Using at Least 10 Accounts with Three Registered Broker-Dealers in his Name and the Names of Others**

     A.    **Overview of Patel's Manipulative Trading Scheme**

22.    To operate his scheme, Patel opened multiple accounts in his own name and in the name of his company NextGen at three different registered broker-dealers.

23.    Patel often used more than one account to place orders for the same securities as part of his scheme, including one "helper" account that he generally used to place non-bona fide limit orders, and another "winner" account to place trades that profited from the price manipulation.

24.    To manipulate the prices of the target securities, Patel generally first built a position in a thinly traded target security by placing a large number of small lot market orders for that security. He made these trades quickly, placing market orders to buy a single security hundreds of times in rapid succession, giving the illusion of widespread demand for the security and increasing the National Best Bid and National Best Offer of the targeted securities.

25.    Because Patel made such a large number of trades in such a short period of time, and generally in thinly traded securities, Patel's trading moved the National Best Bid and National Best Offer of the targeted securities to prices that, at times, were significantly higher than the prices when he started buying.

26.    Second, to keep the National Best Bid and National Best Offer artificially inflated, Patel placed multiple limit buy orders for that same security that he did not intend to execute. These limit buy orders were frequently priced at or just below the National Best Bid price and were visible to the market. Patel sometimes disguised his manipulative trading by placing these limit orders in a separate "helper" account.

6

27.     Third, with the non-bona fide limit buy orders creating the false appearance of continued buying interest, Patel then rapidly sold off all his shares in the security that he had just purchased. Unlike the market buy orders, which Patel made in large numbers of small lots, he sold the securities in larger lots to sell them all quickly at the artificially inflated price.

28.     The visible limit buy orders that Patel held on the buy side helped induce market participants to purchase the shares that he simultaneously was selling at inflated prices.

29.     Finally, once Patel closed out of his position, he immediately canceled the limit orders that he used to help prop up the prices of the target security.

30.     Patel engaged in this type of trading on more than one thousand occasions, sometimes multiple times a day, across hundreds of different securities.

31.     After broker-dealers detected and warned him to cease his manipulative trading, and eventually restricted and/or shut down Patel's accounts, Patel continued his scheme by trading in accounts he opened in the name of an estranged family member ("Family Member"), which he opened without Family Member's knowledge or consent, and in accounts of a friend ("Individual A").

32.     During the Relevant Period, Patel conducted this manipulative trading in more than 400 different securities, the tickers of which are identified in Attachment A.

33.     Overall, Patel used at least the following 10 trading accounts to carry out his scheme and generated more than $5 million in illicit gains from at least May 2021 to at least January 2024:

| Account | Account Holder's Name | Account Number | Broker-Dealer |
|---------|----------------------|----------------|---------------|
| Account 1 | Harsh Patel | xxxx-8644 | Broker-Dealer 1 |
| Account 2 | Harsh Patel | xxxx-0647 | Broker-Dealer 2 |
| Account 3 | Harsh Patel | xxxx-0990 | Broker-Dealer 3 |
| Account 4 | NextGen | xxxx-7041 | Broker-Dealer 1 |
| Account 5 | NextGen | xxxx-6284 | Broker-Dealer 3 |
| Account 6 | Family Member | xxxx-5036 | Broker-Dealer 1 |
| Account 7 | Family Member | xxxx-0853 | Broker-Dealer 3 |
| Account 8 | Family Member | xxxx-2163 | Broker-Dealer 3 |
| Account 9 | Individual A | xxxx-7599 | Broker-Dealer 3 |
| Account 10 | Individual A | xxxx-3220 | Broker-Dealer 3 |

**B.      Examples of Patel's Manipulative Trading**

**1.      AeroCentury Corp. on May 13, 2021**

34.      On May 13, 2021, at 2:45 p.m., the National Best Bid for shares of AeroCentury, Corp. ("AeroCentury") stock, which traded under the ticker symbol "ACY," was approximately $7.35 per share, and the National Best Offer was approximately $7.49 per share.

35.      At approximately 2:45 p.m., Patel placed a market order to buy 2,900 shares of AeroCentury in an account with a registered broker-dealer ("Broker-Dealer 1") in the name of his company, NextGen (identified in the chart above as "Account 4"). This order was immediately filled.

36.      Patel rapidly continued to place similarly sized market orders to buy shares of AeroCentury, one after another, from 2:45 p.m. until approximately 2:56 p.m. During those 11 minutes, Patel placed 22 market orders to purchase a total of 31,800 shares of AeroCentury in Account 4.

37.      As Patel rapidly placed these orders, the National Best Bid began to rise, and by the time of his last market order, the execution price had increased from $7.49 per share for his first market order to $8.50 per share for the last one.

8

38.	Just a few minutes after placing his first market order to buy, beginning at approximately 2:48 p.m., Patel placed limit orders to buy AeroCentury shares from the same account, Account 4. From 2:48 p.m. until approximately 2:56 p.m., Patel placed nine limit buy orders for a total of 28,100 shares of AeroCentury at prices ranging from $7.55 per share to $8.11 per share, thereby displaying to the market demand for AeroCentury shares at those prices. Three of these limit orders were either filled or partially filled and resulted in purchases of an additional 2,145 shares, bringing Patel's total position to 33,945 shares of AeroCentury.

39.	By the time Patel placed his last market buy order at approximately 2:56 p.m., the National Best Bid for AeroCentury had risen to $8.50 per share and the National Best Offer had risen to $8.70 per share—an increase of approximately 16% in the 11 minutes that Patel was trading the stock.

40.	Seconds later, Patel began placing large lot market orders to sell AeroCentury shares, which began executing at around $8.50 per share, while his remaining limit orders to buy 25,955 AeroCentury shares at prices ranging from $7.54 to $8.10 per share were still sitting open, unexecuted, showing demand for AeroCentury shares.

41.	Patel sold all 33,945 of his AeroCentury shares through 11 market orders at prices ranging from $8.21 to $8.52 per share within 10 seconds. In the last second of those sales, Patel canceled all of his open limit orders to buy AeroCentury shares.

42.	Patel's trading activity over the course of those 11 minutes and 20 seconds, all in Account 4, made up approximately half of the volume of the market-wide trading activity in AeroCentury shares during that time, and netted Patel $19,456 in profits.

9

### 2.    Arqit Quantum Inc. ("ARQQ") on October 8, 2021

43.    On October 8, 2021, at approximately 1:11 p.m., the National Best Bid for Arqit Quantum Inc. ("Arqit") stock, which traded under the ticker symbol "ARQQ," was approximately $16.80 per share, and the National Best Offer was approximately $17.00 per share. At that time, Patel began purchasing shares of Arqit in Account 4.

44.    From 1:11 p.m. through approximately 2:33 p.m., Patel purchased approximately 115,000 shares of Arqit in Account 4 by placing 49 market orders and 11 limit orders ranging in price from $16.80 to $18.70 per share.

45.    From approximately 2:19 p.m. to 2:32 p.m., Patel placed various limit orders to buy shares of Arqit in an account with a registered broker-dealer ("Broker-Dealer 2") in his own name (identified in the chart above as "Account 2") priced at $17.40 to $18.25 per share, communicating interest to the market and supporting the increased price.

46.    Starting a minute later, at approximately 2:33 p.m., Patel began to liquidate the Arqit shares in Account 4, beginning with a market sell order that was executed at $18.65 per share.

47.    At approximately the same time, from 2:33 p.m. through 2:35 p.m., Patel placed 35 limit orders in Account 4, each to buy 3,700 shares of Arqit at $17.40 per share. Patel placed these limit orders in Account 4 while he was rapidly selling Arqit shares and closing out his long position.

48.    By 2:35 p.m., Patel had sold most of his Arqit shares, and the National Best Bid had dropped from $18.45 per share when he started selling 90 seconds earlier to $17.50 per share.

49. Patel then canceled the outstanding limit orders to buy Arqit shares that he placed minutes earlier.

50. Patel's trading from approximately 1:11 p.m. to 2:35 p.m. on October 8, 2021 accounted for over 31% of the total trading volume in Arqit and netted him approximately $49,591 in profits.

**C.    Patel Repeatedly Received Compliance Warnings from Broker-Dealers, Lied About his Trading Strategy, and Had his Accounts Restricted and/or Closed.**

51. Patel's trading during the Relevant Period triggered numerous warnings for manipulative trading activity at the various broker-dealers where he held accounts, and, over time, the broker-dealers restricted his trading privileges and/or closed his accounts.

52. For example, on or about May 25, 2021, after a registered broker-dealer firm ("Broker-Dealer 3") had placed a 14-day restriction on an account Patel held in his own name (identified in the chart above as "Account 3"), a representative of Broker-Dealer 3 explained to Patel in a recorded telephone call how his trading practices were manipulating the price of certain securities.

53. The representative pointed out that Patel was taking a low volume stock, placing a large amount of progressively higher-priced buy orders and boosting the price, and then "turning around and selling on that … overly inflated price that you boosted up with the numerous buy orders."

54. The representative further suggested ways that Patel could alter his trading practices to avoid manipulating the price of the stocks he traded.

55. Patel did not change his practices, and Broker-Dealer 3 alerted Patel in September 2021 that it was ending its relationship with him.

56.     In September and October 2021, after Broker-Dealer 3 would no longer service Patel's accounts, Patel moved approximately $3 million from his Broker-Dealer 3 accounts to accounts with Broker-Dealer 1 and Broker-Dealer 2. Patel continued his manipulative practices and received numerous warnings from Broker-Dealer 1 and Broker-Dealer 2 as well.

57.     In October 2021, Broker-Dealer 1 identified trading activity in an account Patel held in his own name (identified in the chart above as "Account 1") that was "giving the appearance of spoofing/layering," because as Patel entered multiple market orders, the price of the security rose, and Patel then placed buy limit orders at lower prices before he entered orders selling the newly acquired shares. A representative of Broker-Dealer 1 warned Patel by telephone in November 2021 to cease trading in the manner that he had been trading. Patel, however, continued his manipulative trading.

58.     Broker-Dealer 1 restricted Patel from placing any more trades in Account 1 and Account 4 in July 2022. Broker-Dealer 2 terminated Account 3 in August 2022. Rather than cease his manipulative trading scheme, Patel simply traded in accounts held in other people's names.

**D.      Patel Traded Using Accounts Held in Other People's Names**

59.     After Broker-Dealer 1 and Broker-Dealer 2 restricted and/or terminated Patel's personal and NextGen accounts, Patel continued his manipulative trading scheme by trading in accounts held in the names of Family Member and Individual A.

**1.      Patel Opened Trading Accounts in Family Member's Name Without Family Member's Knowledge**

60.     In or around August 2022, Patel began to trade in three accounts held in Family Member's name at Broker-Dealer 1 (identified in the chart above as "Account 6") and Broker-Dealer 3 (identified in the chart above as "Account 7" and "Account 8").

61.     Patel opened the accounts in Family Member's name without Family Member's knowledge by using Family Member's personal identity information, and by signing Family Member's name on account opening documents.

62.     From on or about November 9, 2022 through July 30, 2023, Patel traded in Account 6, Account 7, and Account 8 using login credentials he created to access the online platforms of Broker-Dealer 1 and Broker-Dealer 3.

63.     Patel's trading in Account 6, Account 7, and Account 8 triggered warnings at Broker-Dealer 1 and Broker-Dealer 3, just as it did with the trading in his personal and NextGen accounts before they were restricted and/or terminated. Some warnings came through the broker-dealer message systems, which Patel answered as Family Member by using Family Member's credentials to sign into the account without Family Member's knowledge.

64.     Broker-Dealer 1 and Broker-Dealer 3 froze and/or placed restrictions on accounts held in Family Member's name several times in 2023. Patel initially impersonated Family Member on a phone call with Broker-Dealer 1 to address trading issues. Patel later had Family Member speak directly with Broker-Dealer 1 and Broker-Dealer 3 while he listened in and provided responses for Family Member to recite during the calls.

65.     On June 21, 2023, Family Member discussed manipulative trading with a representative from Broker-Dealer 3. The representative noted that the trading in the account held in Family Member's name "could give the impression that … you're intentionally trying to bump up the market in this security, so that you can later sell for a preferable price."

66.     Following Patel's instructions via text message, Family Member told Broker-Dealer 3 that the trading strategy would be modified. Patel, however, continued the manipulative

13

trading in accounts held in Family Member's name with Broker-Dealer 3 into at least July 2023, when he then began trading in Individual A's account.

### 2. Patel Continued his Manipulative Trading in Accounts Held in Individual A's Name

67. In August 2023, Patel discussed with a friend, Individual A, Patel trading under Individual A's name, to which Individual A agreed.

68. Pursuant to that agreement, Patel transferred approximately $847,000 from the accounts he used in Family Member's name to accounts held in Individual A's name with Broker-Dealer 3 (identified in the chart above as "Account 9" and "Account 10"), including an account that Individual A opened in September 2023 for Patel's use.

69. Patel and Individual A agreed that Patel was in charge of the trading activities in Account 9 and Account 10 and would retain any profits from the trading and/or be responsible for any losses.

70. Patel began trading in Account 9 and Account 10 at the end of August 2023.

71. Almost immediately after Patel began trading in Account 9 and Account 10, Patel's trading triggered warnings from Broker-Dealer 3.

72. Patel responded to those warnings using Broker-Dealer 3's internal messaging system, under Individual A's username. Despite receiving multiple warnings, Patel continued his manipulative trading in Account 9 and Account 10, and Broker-Dealer 3 continued to flag some of the trading as potentially manipulative.

73. By early January 2024, Broker-Dealer 3 had restricted or closed Account 9 and Account 10 due to Patel's manipulative trading. In accordance with their agreement, Individual A returned all funds remaining in the accounts to Patel.

**E.      Patel Profited from his Manipulative Trading**

74.      Patel's profits derived from his manipulative trading totaled more than $5 million.

75.      Patel's profits came from manipulative trading in more than 400 securities, as reflected in Attachment A, and spanned from at least May 25, 2021, when Patel was very clearly warned by Broker-Dealer 3 that his trading was manipulative, to at least January 2, 2024, when Patel placed his last trade in an account in Individual A's name.

**II.      Patel Violated the Federal Securities Laws**

76.      During the Relevant Period, Patel traded in ten different accounts, including accounts in other people's names, for the purpose of inducing other market participants to purchase such securities. Patel's orders included limit orders that were non-bona fide.

77.      Patel's trading practices, including his use of non-bona fide limit orders, an overwhelming percentage of which he canceled, allowed him to sell securities at artificially inflated prices.

78.      Patel knew or was reckless in not knowing that his trading practices were inducing others to purchase securities at inflated prices.

79.      Patel had been warned by broker-dealers on multiple occasions that his trading appeared to be manipulative and Patel refused to change his trading pattern. Patel ignored these warnings.

80.      Patel placed non-bona fide orders and used multiple accounts to obscure his identity when trading.

81.      Patel's scheme was in the offer or sale of securities and was done in connection with the purchase and sale of securities.

82.     Patel's non-bona fide limit orders that he placed to deceive investors, only to later cancel most of them, were manipulative. Patel placed these orders to prop up the price of the security for as long as possible to ensure he could sell shares at artificially inflated prices.

83.     Patel knew or was reckless in not knowing that his trading was deceptive.

84.     After receiving numerous warnings and restrictions regarding his trading from Broker-Dealer 1 and Broker Dealer 3, Patel began trading in accounts held in the names of Family Member and Individual A to conceal from Broker-Dealer 1 and Broker-Dealer 3 that he continued his manipulative trading.

85.     Patel intentionally misrepresented information to Broker-Dealer 1 and Broker-Dealer 3 when opening accounts in Family Member's name. Patel falsely represented himself as Family Member when electronically signing the forms and answering various identifying questions.

86.     Patel's misrepresentations and omissions to Broker-Dealer 1 and Broker-Dealer 3 were material, because Broker-Dealer 1 and Broker-Dealer 3 had terminated and/or restricted Patel's trading privileges and would not have allowed him to trade in accounts held in Family Member's name.

87.     Patel's misrepresentations and omissions to Broker-Dealer 1 and Broker-Dealer 3 were in connection with the purchase or sale of a security and in the offer or sale of a security, because the accounts were used to buy and sell securities.

88.     Patel obtained money by making material misrepresentations and omissions to Broker-Dealer 1 and Broker-Dealer 3 because he earned profits by trading in accounts held in the name of Family Member after trading accounts in his own name had been terminated and/or restricted.

## FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Securities Act Section 17(a)

89. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88.

90. Defendant directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes and artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, acts, practices and courses of business which operated as a fraud or deceit upon the purchaser.

91. By reason of the foregoing, Defendant, directly or indirectly, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities
### Violations of Section 10(b) of Exchange Act and Rule 10b-5 Thereunder

92. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88.

93. Defendant, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in

17

transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon other persons.

94.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Market Manipulation
### Violations of Section 9(a)(2) of the Exchange Act

95.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88.

96.    Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

97.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the

18

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by

committing or engaging in specified actions or activities relevant to such violations;

**II.**

Permanently enjoining Defendant and his agents, servants, employees and attorneys and

all persons in active concert or participation with any of them from violating, directly or

indirectly, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)];

**III.**

Ordering Defendant to disgorge all ill-gotten gains received directly or indirectly, with

pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act

Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**IV.**

Ordering Defendant to pay a civil monetary penalty under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**V.**

Permanently enjoining Defendant from, directly or indirectly, opening, maintaining or

trading in any brokerage account(s) in his name, the names of any immediate family members,

the name of any company over which he has any control or the name(s) of any third-party

individuals, without providing the relevant broker-dealer(s) a copy of the complaint and any final

judgment entered against him in this action; and

**VI.**

Granting any other and further relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated:  Philadelphia, PA
       April 20, 2026             SECURITIES AND EXCHANGE COMMISSION

*S/ Karen M. Klotz*
Joseph G. Sansone
Julia C. Green
Gregory R. Bockin
Karen M. Klotz[*]
Attorneys for Plaintiff
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 861-9613 (Klotz)
Email: klotzk@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission

---

[*] Application for admission *pro hac vice* to be filed.